IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 19, 2002 Session

## STATE OF TENNESSEE v. JAMES ALFRED CAREY

**Direct Appeal from the Criminal Court for Sumner County**
**No. 966-1999, 968-1999, 4-2000     Jane Wheatcraft, Judge**

---

**No. M2001-02003-CCA-R3-CD - Filed July 31, 2002**

---

The Defendant pled guilty to one count of selling less than 0.5 grams of cocaine, a Schedule II controlled substance, and to three counts of domestic assault. The trial court sentenced the Defendant as a Range II, multiple offender to ten years incarceration for the drug conviction and to eleven months and twenty-nine days for each of the assault convictions. The trial court ordered that the sentences be served concurrently, but consecutive to a prior sentence. The Defendant now appeals, arguing that he was improperly sentenced. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID G. HAYES and ALAN E. GLENN, JJ., joined.

Randy P. Lucas, Gallatin, Tennessee, for the Appellant, James Alfred Carey.

Paul G. Summers, Attorney General; Jennifer L. Bledsoe, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Dee David Gay, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### I. FACTS

In December 1999, the Sumner County Grand Jury indicted the Defendant, James Alfred Carey, for one count of selling cocaine, a Schedule II controlled substance, in an amount more than 0.5 grams; for one count of domestic assault against Vilisa Sharkley;[1] and for one count of attempted first degree murder against Satonya Fitts. In January 2000, the Sumner County Grand Jury indicted

---

[1] Ms. Sharkley's first name is variously spelled in the record as "Valisa" and "Vilisa." Because the spelling in the indictment is "Vilisa Sharkley," that spelling will be used in this opinion.

the Defendant for one count of assault against Kiley Bittis. On March 15, 2001, the Defendant pled guilty to the reduced offense of the sale of less than 0.5 grams of cocaine. On May 4, 2001, pursuant to a plea agreement, the Defendant entered pleas of guilty to three domestic assault charges, one of which was a reduction of the attempted first degree murder charge involving victim, Satonya Fitts.

On June 12, 2001, the trial court conducted a sentencing hearing to determine the length and manner of service of the Defendant's sentences. At the conclusion of the hearing, the trial court determined that the Defendant was a multiple offender, qualified for a sentencing range of six to ten years for the felony cocaine sale. The court found no mitigating factors and applied three enhancement factors. The court denied alternative sentencing and ordered that the Defendant serve ten years in the Tennessee Department of Correction for the felony sale of cocaine under 0.5 grams. The court further ordered that the Defendant serve eleven months and twenty-nine days on each of the three misdemeanor assault charges. The trial court ordered that the sentences be served concurrently, resulting in an effective sentence of ten years in the Tennessee Department of Correction, to be served consecutively to a prior felony sentence. This appeal ensued.

The facts underlying the Defendant's convictions, as set forth in the indictments and from evidence presented at the sentencing hearing, are as follows: On July 9, 1999, the Defendant sold crack cocaine to an undercover agent in Gallatin, Tennessee. Tennessee Bureau of Investigation laboratory tests revealed the amount of cocaine to be under 0.5 grams. On June 5, 1999, the Defendant assaulted Vilisa Sharkley by holding her down by the face, choking her, beating her about the head, and pulling her hair out during an argument concerning telephone numbers stored in her pager. On June 5, 1999, the Defendant assaulted sixteen-year-old Satonya Fitts. Fitts was eight months pregnant with the Defendant's unborn child at the time. On August 31, 1999, the Defendant assaulted Kiley Bittis by picking her up and dropping or throwing her in a ditch.

The evidence presented at the sentencing hearing was as follows: Sergeant William Sorrells of the Gallatin Police Department testified that he arrested the Defendant on August 31, 1999. He testified that Kiley Bittis approached him and stated that she and the Defendant had formerly been involved in a romantic relationship, but that she had ended their relationship about six months before. According to Sorrells, Bittis also told him that the Defendant had tried to stop her while she was walking on Pemberton Circle, but Bittis did not stop because she was afraid of the Defendant. Sorrells further testified that, according to Bittis, the Defendant became angry when she would not stop, called her names, picked her up over his head, and threw her into a ditch. Bittis also stated to Sorrells that as she was trying to get out of the ditch, the Defendant hit her in the back of the head with his fist. Sorrells testified that he observed various injuries on Bittis, including scrapes on her elbows, a large abrasion on her back, and a large knot on the back of her head. Sorrells testified that Bittis was nineteen years old at the time. Sorrells testified that he spoke with a witness, Mahogany Talley, who was walking with Bittis at the time and who corroborated Bittis' story.

Officer Gail Humes of the Gallatin Police Department testified that on June 5, 1999, she obtained two warrants against the Defendant. She testified that she and several other officers responded to a "shots-fired call" in the area of Alexander Court and Lackey Circle at approximately

7:29 p.m. There they encountered sixteen-year-old Satonya Fitts along with a number of other people. Fitts, who appeared distressed, told them that she was pregnant with the Defendant's unborn child and that approximately five minutes prior to the officers' arrival, she and the Defendant had a verbal altercation. She stated that she had asked the Defendant to leave because she was afraid of him and because she had heard that he had previously beaten another girlfriend earlier. Humes testified that Fitts then stated that the Defendant told her that he "wasn't going to let anyone run his life," whereupon she asked him again to leave. At that point, according to Fitts' report to Humes at the scene, the Defendant, who was about fifteen feet away, pulled a chrome handgun from his waistband, pointed it at Fitts and fired one shot directly at her before walking away and getting into a vehicle of unknown make and model. Humes testified that a .22-caliber shell casing was recovered near the area where Fitts said the Defendant had been standing.

The State introduced an affidavit sworn out at the office of the Defendant's attorney by Fitts subsequent to the night of the offense. In the affidavit, Fitts swore that the Defendant never fired a weapon at her, that she never saw a weapon, and that she never told the police that the Defendant had fired a weapon at her. Humes acknowledged that no laboratory analysis had been performed on the shell casing to determine from what weapon it was fired, nor was it tested for fingerprints. Humes further testified that she was aware of Fitts' affidavit and that no .22-caliber weapon consistent with the facts as alleged originally by Fitts was, at any time, recovered from the Defendant. Humes, however, reaffirmed her testimony that Fitts did tell her that the Defendant had a weapon and that he fired it at her.

Officer Humes also testified about a separate incident on the same day involving the Defendant. When Humes returned to the Gallatin Police Department to obtain warrants for the assault against Fitts, another victim, Vilisa Sharkley, came to the Police Department. Sharkley told Humes that the Defendant had assaulted her at the residence of Patrina Franklin on Lackey Circle. Sharkley stated that the Defendant arrived at the location, demanded her pager, and started looking through the numbers. According to Sharkley, the Defendant then "head-butted" her and told one of the witnesses to leave and come back in about ten minutes so that he could beat Sharkley. Sharkley reported that the Defendant then choked her, beat her about the head, pulled out her hair, and left. The officer testified that she observed a mark on the victim's forehead and "obvious choke marks around her neck." Humes testified that although it is customary to photograph victims who display visible signs of violence, no photographs were taken in this case. Humes explained that such marks do not show up well in photographs of someone who has dark skin. She also testified that the victim declined Humes' suggestion that she obtain medical treatment.

Officer Humes testified that the Defendant was not arrested that evening. Humes noted that an arrest report stated that the Defendant was arrested on the Sharkley charges in October 1999 and that she was not the arresting officer. Humes testified that she had an encounter with the Defendant on a prior occasion, in 1998 or early 1999, when she witnessed the Defendant in possession of a stolen weapon. Humes also related knowledge of an occasion when the Defendant was taken into custody as he fled from a residence in which a weapon was found immediately afterward. She recalled another incident where the Defendant had shot a victim in the leg on Blakemore Street, and

she stated that the Defendant had been convicted of aggravated assault. Humes testified that she was not personally involved in the latter two incidents, but relied on information received from others. Following Humes' testimony, the State introduced into evidence certified copies of the Defendant's prior convictions for aggravated assault and for possession of over 0.5 grams of cocaine with intent to sell.

Michelle Thurman, the Defendant's adoptive mother, testified that she had known and cared for the Defendant since he was three months old. She testified that since the Defendant had been in jail, he seemed like a different person because he had calmed down a lot and "talked better." Thurman also testified that she was aware that the Defendant was working on his G.E.D. She believed he could turn his life around. Thurman stated she wanted the Defendant to come home. Helen Morehead, the Defendant's legal grandmother who raised him, expressed her hope that the Defendant would be able to come home soon. Morehead testified that the Defendant, if given the chance, could become a productive citizen.

The Defendant testified that he had readily admitted his involvement in the crimes to which he was pleading guilty. He maintained that he committed the crimes because of stress and because he was involved with drugs. The Defendant stated that he had been in trouble of one kind or another since he got involved with drugs at the age of sixteen or seventeen. He also said that he sometimes got into trouble because someone else provoked it. The Defendant testified that he had served eight months of a five-year sentence for probation violations. He testified that since becoming incarcerated, he had tried to "turn his life around" by enrolling in anger management classes. He stated that he was working toward his G.E.D. in prison, having been expelled from Gallatin High School. The Defendant explained that he looked forward to sending a picture of himself graduating to his mother when he completed his G.E.D. He also confirmed that he had signed up for drug and alcohol classes, but had been placed on a waiting list. He testified that his experience in the penitentiary system made him want to change and return home to his family. When asked if he was sorry for everything he had done, the Defendant said, "Yes, I regret everything."

The Defendant maintained that he never assaulted Fitts with a gun. He testified that she made the claim about the gun because she was angry that he had "messed" with a lot of women. He stated he had three children, ages four, two, and one, and that he did not want his children to grow up knowing he is in prison. He testified that after he stopped using drugs, he gained weight and could think better than he could when he was on drugs. He also testified that he wanted an opportunity to become a productive citizen. The Defendant stated he was not married and that each of his three children had a different mother. He testified that none of his children lived with him and that he had not supported them financially. He stated that he was expelled from Gallatin High School for "fights and all kind of things." However, he claimed that blame was cast on him, without investigation, for a number of altercations at school.

Regarding his employment history, the Defendant testified that he worked for a period of time at Duncan's Diner as a dishwasher until the restaurant closed in 1996 and that he then worked for William's Disposal for five months in 1998. He testified that his only other means of support

since leaving high school was selling drugs and that he supported himself by selling drugs from 1996 until his arrest, a period of three to four years. The Defendant stated that he sold cocaine and marijuana, but he maintained that he did not sell pills or other drugs. He testified that he got his drugs from two sources and that he sold drugs to the same fifteen people during the entire period. The Defendant admitted that he knew that selling drugs could kill people, but he stated that at the time he was doing it, he cared only about the money. He stated that he made between $600 and $1,000 per week and that he had never reported the income to the Internal Revenue Service.

Regarding his prior record, the Defendant admitted that in July 1998, he was convicted of driving on a suspended license, possession of a 9-millimeter weapon with intent to go armed, and possession of drugs. He confirmed that he was placed on probation for those convictions. The Defendant also confirmed that, while he was still on probation, he pled guilty to shooting Mark Vincent in the leg on September 26, 1998. However, at the hearing, the Defendant claimed that he did not have a weapon that day, that he did not know how the victim got shot, and that he pled guilty only because he "didn't know the system" and "just took anything to get out on the street as soon as [he] could." The Defendant explained, "If I knew better, I would have tried to beat it." The Defendant also admitted that on November 1, 1998, while still on probation, he was caught with 2.5 grams of cocaine in his pocket, and he stated he was also smoking marijuana at the time of his arrest. He confirmed that he pled guilty on March 15, 1999, after serving four months in jail, and received five years' probation. Furthermore, he confirmed that two days later, on March 17, 1999, he violated his probation by testing positive for cocaine and marijuana. Finally, he confirmed that he was on probation when he committed the present offenses.

The Defendant testified regarding the assault on Sharkley as follows: "I went over. I asked for her pager, like they said. We had words, you know. She struck me, so I just grabbed her by the face and pushed her away on the couch. She come up swinging. I pushed her down by her face again just to keep her from hitting me. And my ride came back and I ran up out of the house and left." The Defendant also testified that he briefly saw Satonya Fitts on June 5, 1999. He confirmed that she was sixteen years old and eight months pregnant at the time, but denied that they had an altercation. The Defendant guessed that he had angered her when he struck Sharkley. The Defendant then testified that on August 31, 1999, he assaulted another former girlfriend, Bittis. He said,

> [S]he stopped on the street and she came to me. We talked for a minute, and the conversation got heated up so it turned into an argument. So I put my hands on her. . . . I grabbed her and she struggled away from me and thumped a cigarette and it burned my face. So, you know, I grabbed her again and she swung and hit me with her fist in my mouth. So I picked her up, but I didn't body slam her. I just laid her down in the ditch and held her where she couldn't swing at me. And she was just kicking me and I let her go in the ditch. . . . I did drop her but I never slammed her.

Lastly, the Defendant testified that he knew he had a severe problem, but maintained that he did not believe he was a menace to society.

## II. ANALYSIS

The Defendant pled guilty to one count of selling less than 0.5 grams of cocaine, a Class C felony, for which he was sentenced to ten years incarceration. The Defendant also pled guilty to three counts of domestic assault, a Class A misdemeanor, and the trial court sentenced him to eleven months and twenty-nine days for each of the assault convictions. The Defendant now challenges the length and manner of service of his sentence, raising three issues on appeal. First, the Defendant asserts that the trial court erred by failing to apply mitigating factors and in its application of enhancement factors. In addition, the Defendant asserts that the trial court erred in refusing to consider alternatives to incarceration in sentencing him.

When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of

recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996). On appeal, the defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

## A. LENGTH OF SENTENCE

The Defendant alleges that the trial court erred because it refused to find any mitigating factors despite the evidence presented. The mitigating factors that the Defendant contends the trial court should have applied are not among the statutorily defined mitigating factors set out in Tennessee Code Annotated § 40-35-113. Rather, they are mitigating factors that have been recognized in other cases under a catch-all subsection which includes "[a]ny other factor consistent with the purposes of this chapter." Tenn. Code Ann. § 40-35-113(13).

Specifically, the Defendant alleges that the court should have found his "free" admission of guilt as a mitigating factor. The Defendant relies on State v. Butler, 900 S.W.2d 305 (Tenn. Crim App. 1994), to support the proposition that the admission of guilt is a mitigating factor. In Butler, the defendant voluntarily came forward and confessed his guilt, and the court noted that the case would not have been solved if the defendant had not come forward. Butler, 900 S.W.2d at 314. This case is distinguishable from Butler, because, in the instant case, the Defendant's guilt could still have been proven without the admission. Moreover, the Defendant did not confess his guilt until after he had been caught. The Defendant was arrested on the drug charge when he sold the cocaine to an undercover agent. With regard to the three assaults, the Defendant was not arrested until October 1999, four months after the first two offenses and nearly two months after the last assault.

Additionally, the record clearly shows that the trial court did consider the Defendant's "free" admission of guilt and rejected it as a mitigating factor. The court found that the Defendant refused to take responsibility for his actions. At the sentencing hearing, the Defendant testified that "stress and drugs" made him commit the crimes. He testified that Sharkley had attacked him first and that he had acted in self-defense. He also testified that Bittis attacked him, and he stated that he dropped her in the ditch to prevent her from hitting him. In addition, the Defendant, while pleading guilty to the charge of domestic assault against Fitts, did not plead guilty to attempted first degree murder, the original charge, and still maintains that he did not have an altercation with Fitts, even though he pled guilty to the reduced charge. Consequently, we find no error in the trial court's finding that the Defendant's admission of guilt was not a mitigating factor in this case.

The Defendant next alleges that the trial court erred by not finding the Defendant's expression of remorse as a mitigating factor. Genuine, sincere remorse is a proper basis upon which to mitigate a defendant's sentence. State v. Williamson, 919 S.W.2d 69, 83 (Tenn. Crim. App. 1995). However, "the mere speaking of remorseful words or a genuflection in the direction of remorse will not earn an accused a sentence reduction." Id. The Defendant relies on State v. Antonio Coach, No. 02C01-9805-CC-00160, 1999 Tenn. Crim. App. LEXIS 279 (Tenn. Crim. App., Jackson, Mar. 25, 1999), to support the proposition that remorse is a mitigating factor in Tennessee criminal jurisprudence. While the Coach court did mention in passing that remorse may be used as

a mitigating factor, it failed to conclude that the defendant qualified for a sentence reduction because of mere remorseful words. Id. at *8-9.

Nothing in the record suggests that the Defendant's statements demonstrated genuine remorse. The Defendant's expression of remorse was perfunctory and non-specific. At the sentencing hearing, he was asked, "Are you sorry for what you've done?" The Defendant replied, "Yes, I regret everything." The Defendant gave the overall impression to the court that he did not take responsibility for his actions and that his remorse was, therefore, not genuine.

The Defendant also alleges that the trial court erred in its application of enhancement factors. The trial court in this case found that enhancement factor (1) applied. See Tenn. Code Ann. § 40-35-114(1). That factor is a history of prior convictions and a history of criminal convictions or criminal behavior in addition to those necessary to establish the range. The court also found Tennessee Code Annotated § 40-35-114(8) applicable, namely, the Defendant's previous history of unwillingness to comply with a sentence involving release into the community, as evidenced by the Defendant's prior probation violations. Finally, the court found that Tennessee Code Annotated § 40-35-114(13) was applicable, in that the present felony was committed while the Defendant was on probation. The court concluded that these three factors justified enhancing the sentence to ten years. The weight to be given to both enhancement and mitigating factors is left to the sound discretion of the sentencing judge. State v. Alexander, 957 S.W.2d 1, 5 (Tenn. Crim. App. 1997). The record supports the trial court's finding that these three enhancement factors applied. The trial court properly noted that "the Defendant has a previous history of unwillingness to comply with sentencing involving release into the community. [The Defendant] has been twice on probation and picked up charges, [and] continues to use drugs while . . . on a community-based sentence. He just doesn't appear to take seriously his obligation to the criminal system." The record also supports the trial court's determination that the Defendant is "a danger to society and someone from whom we need protection." We find no abuse of discretion by the trial court in enhancing the sentence to ten years, the maximum sentence within the appropriate range.

## B. ALTERNATIVE SENTENCING

Finally, the Defendant alleges the trial court erred by refusing to consider alternatives to incarceration in sentencing the Defendant. Tennessee Code Annotated § 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration . . . .

A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). Furthermore, unless sufficient evidence rebuts the presumption, "[t]he trial

court must presume that a defendant sentenced to eight years or less and not an offender for whom incarceration is a priority is subject to alternative sentencing and that a sentence other than incarceration would result in successful rehabilitation . . . ." State v. Byrd, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993); see also Tenn. Code Ann. § 40-35-303(a).

However, all offenders who meet the criteria are not entitled to relief; instead, sentencing issues must be determined by the facts and circumstances of each case. See State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987) (citing Moss, 727 S.W.2d at 235). Even if a defendant is presumed to be a favorable candidate for alternative sentencing under Tennessee Code Annotated § 40-35-102(6), the statutory presumption of an alternative sentence may be overcome if

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1)(A)-(C). In choosing among possible sentencing alternatives, the trial court should also consider Tennessee Code Annotated § 40-35-103(5), which states, in pertinent part, "The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5); see also State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994).

The Defendant misstates the law in contending that a multiple offender convicted of a Class C felony is presumed to be a favorable candidate for alternative sentencing options under Tennessee Code Annotated § 40-35-102(6). It is, rather, the especially mitigated or standard offender who is presumed to be a favorable candidate for such sentencing considerations. See Tenn. Code Ann. § 40-30-102(6).

Furthermore, at the conclusion of the sentencing hearing, the trial court noted that the Defendant was a twenty-one-year-old man who had two prior felony convictions and numerous misdemeanors convictions, which concerned the court because the Defendant's prior offenses involved drugs and weapons. The court also noted that the Defendant had a poor social history and a history of violence. The court determined that the Defendant was a danger to society and that he was someone from whom society needed protection. The trial court found that the Defendant had not assumed responsibility for his actions because he maintained that each of his assaults was, in some measure, self-defense. We conclude that the record supports these findings by the trial court.

The record in this case indicates that the trial court adequately considered the enhancement and mitigating factors as well as the underlying facts. Our review also reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing

law, and that the trial court's findings of fact are adequately supported by the record.  We find that the Defendant has not met his burden of showing any impropriety in the sentence imposed.

Accordingly, the sentence imposed by the trial court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE